FILED

2012 May-18  PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CAROL SHULER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:11-cv-3443-TMP |
| | ) | |
| INFINITY PROPERTY & CASUALTY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

REPORT AND RECOMMENDATION

This cause is before the court on several motions to dismiss claims or defendants from the action on various grounds.  These motions include those by defendants Laura Nettles (Doc. 8), Wayne Morse (Doc. 9), American Express Company and NCO Financial Systems, Inc. (Doc. 10), and Infinity Insurance Company,[1] Tobin Lunsford, and Pamela Jenkins (Doc. 15).[2]  To date, the parties have not consented to the exercise of dispositive jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

---

[1]  The motion to dismiss was filed by "Infinity Insurance Company," rather than the named defendant, "Infinity Property & Casualty."  Infinity Insurance Company asserts that it, not Infinity Property & Casualty, was the plaintiff's actual employer, and that it is a wholly-owned subsidiary of Infinity Property & Casualty Corporation.  (*See* Doc. 16).  To date, plaintiff has not agreed or disagreed expressly with this assertion and continues to refer to "Infinity Property & Casualty" as the defendant in this action.  (*See* Doc. 20).

[2]  A motion to dismiss filed by defendant Angie Ingram (Doc. 7) was supported by materials outside the pleadings and, therefore has been converted to a motion for summary judgment, which will be considered later.  An additional defendant, Gregory Kees, has not been served or made an appearance.

I. Introduction

This action began with the filing of the plaintiff's *pro se* complaint on September 22, 2011, in which she named as defendants Infinity Property & Casualty, Tobin Lunsford, Gregory Kees, Pamela Jenkins, Angie Ingram, Laura Nettles, Wayne Morse, American Express Company, and NCO Financial Systems, Inc.  In various combinations, plaintiff has attempted to allege claims under 42 U.S.C. §§ 1983, 1985(2), and 1986; Title VII of the Civil Rights Act of 1964; the Age Discrimination in Employment Act ("ADEA"); the Americans with Disabilities Act ("ADA"), and under Alabama law for wrongful interference with a business relationship.  Specifically, in Count One of the complaint, she alleges that the "Infinity defendants"[3] violated her rights under § 1983 and the ADEA by taking certain employment disciplinary actions against her due to her age.  In Count Two, she alleges similarly that the "Infinity defendants" violated her rights under § 1983 and the ADEA when her employment was terminated due to her age.  Count Three alleges that the "Infinity defendants" discriminated against plaintiff on the basis of gender by taking certain "above-described actions" with respect to her employment.[4]  Likewise, Count Four of the complaint asserts gender discrimination by the "Infinity defendants" in plaintiff's termination.  Count Five alleges that Infinity and the "legal/financial defendants"[5] conspired to cause plaintiff's termination because she

---

[3]  The complaint does not define the term "Infinity defendants," but the court will assume this includes defendant Infinity Property & Casualty and defendants Lunsford, Jenkins, and Kees, who are or were employees of Infinity.

[4]  Count Three expressly relies on 42 U.S.C. § 1983 as the foundation for the legal claim. In her response to the motions to dismiss, however, plaintiff acknowledges that this is incorrect, and that the true basis for the claim is Title VII.

[5]  Again, the complaint does not identify specifically which defendants are included in the "legal/financial defendants" group, but the court assumes it is comprised of all defendants other than the "Infinity defendants."  This would include American Express, NCO Financial, Ingram, Nettles,

was then a plaintiff in a Fair Debt Collection Practices Act lawsuit against defendants NCO and Ingram with respect to a debt owed by plaintiff's husband to American Express, all in violation of 42 U.S.C. § 1985(2).   Count Six follows up the allegation in Count Five by asserting that the "Infinity defendants" knew of the conspiracy alleged in Count Five and did nothing to prevent, in violation of 42 U.S.C. § 1986.  Finally, Count Seven of the complaint alleges a claim under Alabama state law, that the "legal/financial defendants" unlawfully and intentionally interfered with the employer-employee relationship between plaintiff and Infinity Property & Casualty, causing her to be terminated from employment.

In response to these claims, various defendants have moved for dismissal, arguing generally that the complaint relies upon legal grounds that do not support the claims, or that the complaint fails to allege sufficient factual allegations to state a claim under the pleading standards in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).  For instance, several defendants point out that § 1983 simply does not apply to purely private parties and conduct, a proposition acknowledged by the plaintiff in her response to the motions to dismiss.  Defendants American Express, NCO, Nettles and Morse also argue that § 1985(2) does not provide a basis for a claim of civil-rights conspiracy against them, or, alternatively, that the complaint fails to allege sufficient facts to support such a claim.

The court addresses each of these arguments in turn.

---

and Morse.

II. <u>Discussion</u>

A. *Section 1983 Claims*

Counts One, Two, Three, and Four all expressly allege claims grounded on § 1983, sounding in age discrimination and gender discrimination against the "Infinity defendants." Plaintiff alleges with respect to these counts that she had been employed by defendant Infinity Property & Casualty for several years when a new manager, Gregory Kees, changed her report-to-work time from 9:00 a.m. to 9:30 a.m. in order to accommodate the companies west coast clients. She alleges that Kees, however, failed to make a change in the company's time-keeping system, which then recorded her as tardy several weeks when she reported to work at 9:30 as instructed by Kees. Although the time change was made on June 26, 2009, Kees did not bring the alleged tardies to the plaintiff's attention until he issued her a written warning on September 16, 2009. Additionally the warning stated that plaintiff had been abusing her sick-leave benefit by taking multiple Mondays as leave. Plaintiff alleges that this is factually incorrect, as she always took scheduled vacation leave, not sick leave. Based on those assertions, Kees put plaintiff on 90-days probation for attendance problems. Unhappy with the warning and probation, plaintiff scheduled a meeting with a human resources representative, defendant Pamela Jenkins, to discuss the situation. Before the meeting occurred, however, plaintiff was called into Kees's office, where he made remarks plaintiff took to be threats to her job if she went forward with the meeting with Jenkins. A few days later, on September 24, 2009, plaintiff attended a birthday lunch for a co-worker. When she returned to work after lunch, Kees called her into his office notified her that she was being terminated because she was late returning from lunch. Plaintiff returned from lunch with a group of co-workers, but only she was disciplined. At the time, plaintiff was 49 years old, and she alleges that younger employees and male

4

employees were allowed to schedule "flex time" for their hours of attendance, which freed these employees from having specific start times or times to return from lunch. She also alleges that as Kees escorted her from the building, he acknowledged that he had changed her start-to-work time to 9:30, implying that the tardies charged to her were bogus.

Defendants Infinity, Lunsford, and Jenkins all move to dismiss any claims against them under § 1983. In response to the motion, plaintiff agrees that § 1983 does not cover purely private parties and conduct, but she contends that, consistent with the introductory paragraph of her complaint, she intended for these four counts to rest on Title VII for gender discrimination and the ADEA for age discrimination. Indeed, Counts One and Two explicitly refer to the ADEA, as well as § 1983.

While the court agrees that § 1983 cannot supply a legal theory against these defendants, the plaintiff's complaint can be read as asserting claims under the ADEA in Counts One and Two and under Title VII in Counts Three and Four. Section 1983 requires an allegation that the defendant sued was acting under "color of state law" at the time he or she deprives the plaintiff of a constitutional right. *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 98 S. Ct. 1729, 56 L. Ed. 2d 185 (1978). As a general rule, whether a defendant is a "state actor" for purposes of § 1983 involves three potential scenarios:

> [1. T]here is a sufficiently close nexus between the State and the challenged action... so that the action of the [private entity] may be fairly treated as that of the State itself. ...
>
> [2. The State] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State. ...
>
> [3. T]he private entity has exercised powers that are 'traditionally the exclusive prerogative of the State.'

*Blum v. Yaretsky*, 457 U.S. 991, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982)(citations omitted).  The

Supreme Court explained in *Lugar v. Edmundson Oil Co., Inc.*, that to recover under 42 U.S.C. 1983

against a private person or entity:

> First, the deprivation must be caused by the exercise of some right or privilege
> created by the State or by a rule of conduct imposed by the state or by a person for
> whom the State is responsible.  [...] Second, the party charged with the deprivation
> must be a person who may fairly be said to be a state actor."

457 U.S. 922, 937 (1982).  Nothing in these allegations fits any of these scenarios for denominating

either Infinity, Lunsford, or Jenkins as being "state actors" with respect to plaintiff's employment.

Infinity and its employees are identified as being purely private entities, not associated with the State

in any way.  Thus, because the "state action" element of a claim under § 1983 is missing, the motion

to dismiss should be granted to the limited extent of dismissing any theory resting on § 1983.[6]

        B.  *Claims under the ADEA and Title VII*

Having said that, it is also clear that the *pro se* plaintiff has alleged enough to state claims

for relief under Title VII and the ADEA.  In Counts One and Two she alleges explicitly under the

ADEA that she was disciplined (warned and put on probation) for tardies that not only did not exist,

but also that younger employees were allowed to use "flex time" scheduling to avoid having a fixed

start-to-work time.  In Counts Three and Four, although she does not explicitly refer to Title VII, she

does expressly allege gender discrimination in employment, based on the allegation that male

employees were allowed to use "flex time" scheduling and she was not.  Particularly in *pro se*

---

     [6]  Also, while not argued, the court notes that plaintiff has not alleged a deprivation of a
*constitutional* right.  Her employment with a private corporation was not a right created or protected
by the constitution.

pleadings, the court is to disregard labels and headings, and give the pleadings a construction based in their substance. *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1252 n.11 (11th Cir. 2005), quoting 5 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1286 (3d ed. 2004) that a pleading must be judged "by the quality of its substance rather than according to its form or label and, if possible, it will be construed to give effect to all its averments." *See also Gilmore v. Director, U.S. Dept. of Labor, Office of Workers Compensation Programs*, 455 Fed. Appx. 934, 935 (11th Cir., Feb. 6, 2012) ("The district court has an obligation to look behind the label of a pro se motion and, if possible, interpret it as any request for relief over which the court may have jurisdiction"), citing *United States v. Jordan*, 915 F.2d 622, 624–25 (11th Cir. 1990). Also, "[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). In light of the introductory paragraph's express invocation of Title VII, it is not difficult to read plaintiff's gender discrimination claims in Counts Three and Four as seeking relief under Title VII, not § 1983.

Infinity, Lunsford, and Jenkins also argue that Counts One, Two, Three, and Four should be dismissed because they simply fail to state claims under, respectively the ADEA (Counts One and Two) and Title VII (Counts Three and Four). They correctly note that under either of these theories, only the plaintiff's employer, Infinity Property & Casualty (as alleged here), can be sued. Plainly, plaintiff's co-employees, Lunsford and Jenkins, are not suable defendants under the ADEA or Title VII because they were not her "employer." *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991) ("The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act."); *Smith v. Lomax*, 45 F.3d 402,

403 n. 4 (11th Cir. 1995) (Individuals "cannot be held liable under the ADEA or Title VII."); *Mason v. Stallings*, 82 F.3d 1007 (11th Cir. 1996) (no individual liability under the ADA).  Thus, the motion to dismiss these counts as to Lunsford and Jenkins, individually, should be granted.

As to Infinity itself, the motion should be denied.  As stated above, the *pro se* plaintiff has alleged that she was subjected to discriminatory discipline (a warning and probation) and ultimate termination due to her gender and age.  She alleged facts tending to show that she was held to a higher attendance standard that younger and male employees.  While the court agrees that the factual allegations are thin, they are enough to survive a motion to dismiss, even under the *Twombly/Iqbal* standard.   The allegations identify the specific employment decisions she contends were discriminatory, and she alleges that younger employees and male employees were treated more favorably than she with respect to such decisions.  Indeed, she alleges that both Kees and Jenkins have acknowledged that the grounds for her discipline and termination were bogus.  This implies that the true motivation for the actions taken was something else, which could plausibly be age or gender discrimination.

Although the court recognizes that defendant Infinity, citing *Gross v.  FBL Financial Services, Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 2351, 174 L. Ed. 2d 119 (2009), argues that the plaintiff cannot prevail on *both* age and gender discrimination claims, the court does not believe that the "but for" element in ADEA actions prohibits a plaintiff from *pleading* alternative theories of liability.  At the pleading stage of a case, Rule 8(d)(3) of the Federal Rules of Civil Procedure plainly provides that "A party may state as many separate claims or defenses as it has, *regardless of consistency*." (emphasis added).  Thus, simply because an ADEA claim and a gender-discrimination claim  ultimately may be inconsistent with one another because of the "but for" requirement of an

ADEA claim, this does not mean that a plaintiff must choose between them at the *pleading* stage of the case. The plaintiff may plead them alternatively and then determine through discovery which is better supported by the evidence and consistent with the true motivation for the employment decisions taken against her. At this stage, therefore, Infinity is not entitled to dismissal of either claim.

### C. *ADA Claims*

Although the introductory paragraph of the complaint refers to the Americans with Disabilities Act and plaintiff mentions being treated for anxiety and depression at paragraph 26, none of the counts alleging theories of recovery ever actually plead a claim for violation of the ADA. Plaintiff explicitly alleges claims for gender and age discrimination, but never alleges disability discrimination in any of the seven counts of the complaint. Unlike Counts Three and Four, which allege gender discrimination sufficiently to allow the court to conclude that she has pleaded a Title VII claim even though she expressly relied upon § 1983, nowhere in the complaint does plaintiff allege any facts tending show that she suffered employment discrimination due to her anxiety and depression. Therefore, insofar as the complaint might be read as attempting to allege disability discrimination claims, such are due to be dismissed for failure to state a claim.

### D. *Conspiracy Claims under § 1985(2)*

Plaintiff alleges at Count Five of the complaint that Infinity and the "legal/financial defendants" conspired to terminate plaintiff's employment with Infinity "because she was a party to a lawsuit against entities connected to the financial-services/debt collection industries." The factual allegations incorporated into Count Five assert that American Express claimed a debt owed to it by plaintiff's husband, Roger Shuler, which it placed with NCO Financial Systems for

collection.  NCO in turn contacted an attorney, Angie Ingram, for collection.  As a result of these

collection activities, both plaintiff and her husband sued NCO and Angie Ingram, alleging violations

of the Fair Debt Collection Practices Act ("FDCPA").  In that lawsuit, NCO was represented by

present-defendant Laura Nettles, while Angie Ingram was represented by present-defendant Wayne

Morse.  Plaintiff alleges that defendant Nettles (and her law firm of Lloyd, Gray & Whitehead) had

a close relationship with Infinity, having represented it in a number of cases.  An in-house lawyer

at Infinity, Erin May, formerly was an associate at Lloyd, Gray & Whitehead and, as alleged by

plaintiff, still maintained a close friendship with Nettles.  Plaintiff alleges that she and her husband

met with their attorneys in the FDCPA lawsuit on a Monday, September 14, 2009, and instructed

their lawyers to aggressively pursue discovery in the matter.[7]  Two days later, on September 16,

2009, plaintiff received the written warning and probation from her supervisor, Kees.  Eight days

later, on September 24, 2009, she was terminated.

Based on these facts, plaintiff contends that Infinity[8] and the "legal/financial defendants,"

which the court reads to mean Nettles, Morse, Ingram,[9] American Express, and NCO, entered into

a conspiracy to threaten and intimidate the plaintiff and her husbands into dropping their FDCPA

---

[7]  That the meeting occurred on a Monday is significant.  One of the grounds for the warning
and probation given to plaintiff two days later was that she had been abusing her sick-leave benefit
by taking Mondays off.  Plaintiff contends that all of her Mondays off were scheduled vacation time,
not sick leave.  Her Monday meeting with her attorneys just two days before the warning and
probation appears to be the precipitating event for the action taken against her.

[8]  In this count, plaintiff expressly mentions only Infinity, not the "Infinity defendants."  The
court takes this to mean that she intends to allege the § 1985(2) conspiracy claim against Infinity
only, not Jenkins, Kees, and Lunsford.

[9]  Ingram's motion to dismiss is not presently before the court for consideration as it has been
converted to a motion for summary judgment to which the parties have been given time respond
later.

lawsuit.  Citing 42 U.S.C. § 1985(2), she alleges that this violated her constitutional rights by attempting to deprive her of the right to litigate her claims in federal court.

The application of § 1985(2) to the facts as alleged in the complaint requires a careful understanding of its statutory structure.[10]  There are two main clauses in § 1985(2), separated by a semicolon, and these two clauses have very different required elements.  Broken at the semicolon to emphasize the separate clauses, section 1985(2) states the following:

**(2) Obstructing justice; intimidating party, witness, or juror**

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror;

or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;....

---

[10]  The difficult structure and syntax of § 1985 have provoked comments by other courts.  For example, the Third Circuit has written the following:

Almost Kantian in length and complexity, the revision that eventually became section 1985 is a paradigm of poor draftsmanship.  In *Brawer v. Horowitz*, 535 F.2d 830, 837 (3d Cir.1976), Judge Aldisert referred to "the perfidious syntax of § 1985(2)."  In somewhat less colorful terms, the Supreme Court acknowledged that the "length and style" of the 1871 Act "make it somewhat difficult to parse."  *Kush v. Rutledge*, 460 U.S. 719, 724, 103 S. Ct. 1483, 75 L. Ed. 2d 413 (1983).

*Heffernan v. Hunter*, 189 F.3d 405, 409 (3d Cir. 1999).

11

Section 1985(3) provides the remedy of a private cause of action for anyone suffering a violation

defined in § 1985(2), as follows:

### (3) Depriving persons of rights or privileges

* * *

in any case of conspiracy set forth in this section, if one or more persons engaged
therein do, or cause to be done, any act in furtherance of the object of such
conspiracy, whereby another is injured in his person or property, or deprived of
having and exercising any right or privilege of a citizen of the United States, the party
so injured or deprived may have an action for the recovery of damages occasioned
by such injury or deprivation, against any one or more of the conspirators.

This statute derives from the 1871 Ku Klux Klan Act (also known as the Civil Rights Act of 1871),

which was intended by the post-Civil War Congress to secure the rights and privileges of citizenship

to the newly-freed African-American slaves. *Chavis v. Clayton County School District*, 300 F.3d

1288, 1292 (11th Cir. 2002).  For this reason many courts concluded that the Act was intended only

to prohibit conspiracies that were motivated by racial or class-based animus to deny the equal rights

of citizenship to African-Americans. *See, e.g., Kimble v. D. J. McDuffy*, *Inc.*, 648 F.2d 340 (5th Cir.

1981).  However, in *Kush v. Rutledge*, 460 U.S. 719, 103 S. Ct. 1483, 75 L. Ed. 2d 413 (1983), the

Supreme Court held that, with respect to the *first* clause of § 1985(2), racial or class-based animus

was not a required element of a claim.  The Court wrote:

Given the structure of § 2 of the 1871 Act, it is clear that Congress did not intend to
impose a requirement of class-based animus on persons seeking to prove a violation
of their rights *under the first clause of § 1985(2)*.  The legislative history supports the
conclusion we have drawn from the language of the statute.  Protection of the
processes of the federal courts was an essential component of Congress' solution to
disorder and anarchy in the southern States.  Neither proponents nor opponents of the

bill had any doubt that the Constitution gave Congress the power to prohibit intimidation of parties, witnesses, and jurors in federal courts. [Emphasis added].

*Id.* at 727, 103 S. Ct. at 1488.  Thus, the critical elements of a claim under the first clause are the existence of a conspiracy designed to interfere with the due course of justice in federal court by intimidating or retaliating against witnesses or jurors, resulting in damage to someone.  There is no requirement that such intimidation or retaliation be motivated by a racial or class-based animus.  *See Haddle v. Garrison*, 525 U.S. 121, 125, 119 S. Ct. 489, 492, 142 L. Ed. 2d 502 (1998) ("The gist of the wrong at which § 1985(2) is directed is ... [the] intimidation or retaliation against witnesses in federal-court proceedings").

A claim under the *second* clause of § 1985(2) is a different matter.  Unlike the first clause, where there is no mention of an equal-protection component, the second clause explicitly requires that the conspiracy formed to hinder or interfere with the due course of justice in any State or Territory must be motivated by the "intent to deny to any citizen the equal protection of the laws." This means that, unlike the first clause at issue in *Kush*, a claim under the second clause must allege and prove a racial or class-based animus underlying the conspiracy.  *See Chavis v. Clayton County School District*, 300 F.3d 1288 (11th Cir. 2002).  Since *Kush*, the Eleventh Circuit has explained:

> According to the Supreme Court, the Reconstruction civil rights acts, such as section 1985, are to be "accord(ed) [] a sweep as broad as (their) language." *Griffin v. Breckenridge*, 403 U.S. 88, 97, 91 S. Ct. 1790, 1796, 29 L. Ed. 2d 338 (1971) (citations omitted).  We keep this consideration in mind as we examine the second clause of section 1985(2).  The second clause of section 1985(2) expressly supports a cause of action against private conspiracies which seek to injure a person "for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws." 42 U.S.C. § 1985(2).  The "equal protection" language included in the second clause of section 1985(2), requires an allegation of class-based animus for the statement of a claim. *See Griffin*, 403 U.S.

13

at 102, 91 S. Ct. at 1798 (stating that under section 1985(3) the language requiring an intent to deprive of equal protection means there must be some racial, or perhaps otherwise class-based individually discriminatory claims behind the conspirators' action).

*Id.* at 1292.

Plaintiff cites the case of *Haddle v. Garrison*, 525 U.S. 121, 119 S. Ct. 489, 142 L. Ed. 2d 502 (1998), in support of her claim.  There, the Supreme Court held that a conspiracy to deprive a person of his at-will job in order to interfere with testimony in federal court, plainly a claim brought under the *first* clause of § 1985(2), stated a cause of action under the statute.  In overruling the Eleventh Circuit's precedent in *Morast v. Lance,* 807 F.2d 926 (11ᵗʰ Cir. 1987), the Supreme Court wrote:

> We disagree with the Eleventh Circuit's conclusion that petitioner must suffer an injury to a "constitutionally protected property interest" to state a claim for damages under § 1985(2).  Nothing in the language or purpose of the proscriptions in the first clause of § 1985(2), nor in its attendant remedial provisions, establishes such a requirement.  The gist of the wrong at which § 1985(2) is directed is not deprivation of property, but intimidation or retaliation against witnesses in federal-court proceedings.  The terms "injured in his person or property" define the harm that the victim may suffer as a result of the conspiracy to intimidate or retaliate.  Thus, the fact that employment at will is not "property" for purposes of the Due Process Clause, *see Bishop v. Wood*, 426 U.S. 341, 345-347, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976), does not mean that loss of at-will employment may not "injur[e] [petitioner] in his person or property" for purposes of § 1985(2).

> We hold that the sort of harm alleged by petitioner here – essentially third-party interference with at-will employment relationships – states a claim for relief under § 1985(2).  Such harm has long been a compensable injury under tort law, and we see no reason to ignore this tradition in this case.

*Id.* at 125-126, 119 S. Ct. at 492.

The initial question presented in the instant case is whether plaintiff frames her § 1985(2) claim under the first or second clause.  She merely alleges that her employment with Infinity was unlawfully terminated "because she was a party to a [federal] lawsuit against entities connected to the financial-service/debt collection industries."  It seems obvious to the court that, as a party in a lawsuit, one is also a "witness" or at least a potential witness in federal court.  *Cf. Chahal v. Paine Webber Inc.*, 725 F.2d 20, 24 (2d Cir.1984), aff'd, 483 U.S. 143, 107 S. Ct. 2759, 97 L. Ed. 2d 121 (1987) (§ 1985(2) covers intimidation of "potential" witnesses in federal litigation); *Aque v. Home Depot U.S.A.*, 629 F.Supp. 2d 1336 (N.D. Ga., 2009).  If, indeed, as the result of a conspiratorial agreement,  plaintiff was fired from her job *because* she was a party (or potential witness) in a federal lawsuit, she has stated a potential claim under the *first* clause of § 1985(2).  She has alleged that the purpose of the conspiracy was to intimidate her into dropping her FDCPA case, or to retaliate against her for having commenced it, and that she was harmed in her "property" when she was terminated from employment.  *See Haddle v. Garrsion*, supra.

It is also clear that plaintiff has not attempted to allege a claim under the *second* clause of the statute because she has not alleged that her termination was motivated by a racial or class-based animus.  Rather, she has expressly stated that the motivation for her termination was her participation in the federal FDCPA lawsuit.  Thus, the court will analyze plaintiff's claim only under the *first* clause of the Act.

 The problem with the complaint, argued by defendants, is that it fails to allege sufficient facts to meet the requirements of showing "an entitlement to relief" under the *Twombly/Iqbal* standard.  They contend that the facts pleaded simply do not show a plausible conspiracy to terminate

plaintiff's job to intimidate her or retaliate against her for prosecuting her FDCPA case.  The court agrees.

The Eleventh Circuit Court of Appeals has stated that a complaint requires "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *American Dental Association v. Cigna Corp.* 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); *see Ashcroft v. Iqbal,* 129 U.S. 1937 (2009).  *Twombly* instructs that "a formulaic recitation of the elements of a cause of action will not do."  550 U.S. at 553.  The factual allegations must be sufficient to nudge the claim "across the line from conceivable to plausible."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).  The claim must be more than merely "speculative."  "[C]ourts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer. *Am. Dental Ass'n v. Cigna Corp*., 605 F.3d 1283, 1290 (11th Cir. 2010), citing  *Iqbal* at 1951–52 (quoting *Twombly,* 550 U.S. at 567, 127 S. Ct. at 1972).  Where there are such alternative explanations, the plausibility standard seems to require enough factual pleading to nudge the claim more toward the inference of illegal conduct to overcome the possibility that the conduct involved was legal.

For the court, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, at 679, 129 S. Ct. at 1950.  Because *Twombly* must be applied to all civil cases, not

16

just allegations of conspiracy, *Iqbal*, at 682,  129 S. Ct. at 1953, *Iqbal* provides a two-step process

for analyzing a complaint: "1) eliminate any allegations in the complaint that are merely legal

conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then

determine whether they plausibly give rise to an entitlement to relief.'" *American Dental*, at 1290

(quoting *Iqbal*, at 679, 129 S. Ct. at 1949-1950).

The plausibility standard is not the same as a "probability" that the claim will succeed.  As

the Eleventh Circuit explained in *Speaker v. U.S. Dept. of Health and Human Services Centers for*

*Disease Control and Prevention*, 623 F.3d 1371 (11th Cir. 2010):

> In *Twombly*, the Supreme Court distinguished "plausible" claims from allegations
> that were merely "conceivable," and stated that the Court "[did] not require
> heightened fact pleading of specifics, but only enough facts to state a claim to relief
> that is plausible on its face." *Id*. at 570, 127 S. Ct. at 1974.  The Supreme Court
> explained that a complaint "does not need detailed factual allegations," but the
> allegations "must be enough to raise a right to relief above the speculative level."  *Id.*
> at 555, 127 S. Ct. at 1964-65.  Furthermore, "a well-pleaded complaint may proceed
> even if it strikes a savvy judge that actual proof of those facts is improbable, and that
> a recovery is very remote and unlikely."  *Id.* at 556, 127 S. Ct. at 1965 (quotation
> marks omitted).
>
> Subsequently, in *Iqbal* the Supreme Court clarified that "[a] claim has facial
> plausibility when the plaintiff pleads factual content that allows the court to draw the
> reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at
> 1949; *see also Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007)
> ("The Court has instructed us that the rule 'does not impose a probability requirement
> at the pleading stage,' but instead 'simply calls for enough fact to raise a reasonable
> expectation that discovery will reveal evidence of' the necessary element.") (quoting
> *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

*Id.* at 1380.

Turning to the facts as alleged in the complaint and the reasonable inferences that can be

drawn from them, the court believes the plaintiff has failed to state a plausible claim of conspiracy

among the defendants[11] under § 1985(2) to intimidate and retaliate against her as a witness in her FDCPA lawsuit. The complaint alleges that plaintiff was engaged in civil litigation with NCO and Angie Ingram over her claim that NCO and Ingram violated the Fair Debt Collection Practices Act, and that NCO was represented by attorney Laura Nettles of the firm of Lloyd, Gray & Whitehead. Lloyd, Gray & Whitehead also represented Infinity, plaintiff's employer, in several other legal matters, and, in fact, a former associate of the firm and friend of Nettles, Erin May, had taken a job as an in-house attorney at Infinity. Two days after meeting with her attorneys over discovery matters in the FDCPA litigation and shortly before she was scheduled to give a deposition in the case, plaintiff received a warning and probation from her supervisor, Gregory Kees, for excessive tardies and for abusing her sick-leave benefit by taking off several Mondays. Plaintiff alleges not only that each of these stated reasons is false, but that supervisory employees at Infinity, Pamela Jenkins and Kees, admitted to her later that they were bogus. A week later, plaintiff alleges, she was terminated because she was late returning from a co-employee's birthday lunch, as were several other employees who were not disciplined. At that point, plaintiff's FDCPA case against NCO and Ingram had been pending for about a year.

Plaintiff asserts that it is a reasonable and plausible inference from these events that Nettles, acting as NCO's lawyer and using her contacts with her friend May, persuaded Infinity to terminate plaintiff because she was suing a client of Nettles and her law firm. She asserts that this inference is reasonable because not only did Nettles and the Lloyd, Gray & Whitehead firm have a pre-existing relationship and credibility with Infinity, but that the absence of any legitimate reason for her

---

[11] As defendant Ingram's motion is not now before the court, the court expresses no opinion about the viability of the claim against her at this point.

termination implies that something else caused her termination.  She points to the timing of her warning and probation occurring just two days after she had a Monday meeting with her lawyers in the case.  According to plaintiff, the pending and apparently acrimonious litigation between Nettles' client and plaintiff was reason enough for Nettles to use her influence with Infinity to deter and intimidate plaintiff with respect to the litigation.

The defendants argue that these are vague or conclusory allegations, insufficient to plead a conspiracy claim.  *Cf. Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984).  Plaintiff has responded by pointing to specific actions taken against her, admissions that those acts were unjustified, and the existence of a relationship and motivation between Nettles and Infinity to disadvantage plaintiff in her litigation with Nettles' client.  She points to a particular reason why the actions were taken, and the specific time frame in which they occurred.  While admitting that the complaint does not and apparently cannot allege a specific communication between Nettles and Infinity in which the conspiratorial agreement was forged, she contends that  "the existence of an agreement in a conspiracy case is rarely proven by direct evidence that the conspirators formally entered or reached an agreement.... The more common method of proving an agreement is through circumstantial evidence." *United States v. Ervin*, 300 Fed. Appx. 845, 848 (11th Cir. 2008) (citation and internal quotations omitted).  In the end, plaintiff asserts that these allegations give Nettles and Infinity fair notice of the basis of her claim against them.

Despite these arguments, the court is not persuaded that the allegations of the complaint are sufficient to state a plausible claim of conspiracy between Nettles and Infinity, and they certainly are not sufficient to raise a reasonable inference that NCO, American Express, or Morse were involved in any such unlawful agreement.  With respect to American Express and Morse, there are absolutely

no facts pleaded supporting an inference that they participated in or knew of a conspiracy against plaintiff.  Even under plaintiff's view of the facts, it was Nettles and her law firm that had a relationship with Infinity which allegedly allowed them to exert influence.  There are no facts pleaded  showing any such relationship involving American Express and Morse.  There is no fact-based reason to believe that either American Express or Morse could have sought to influence Infinity with respect to plaintiff's employment.  Thus, plaintiff has not alleged a plausible conspiracy claim against these two defendants.

The same reasoning applies to NCO.  Although plaintiff alleges that it was NCO's counsel, Nettles, who influenced Infinity to terminate plaintiff's employment, there is no allegation or inference that NCO knew anything about it, approved it, or participated in it.  The existence of the attorney-client relationship between Nettles and NCO alone does not establish that NCO participated in a conspiracy, even though it was the intended beneficiary of the alleged influence exercised by Nettles.[12]  Unlike the relationship between Nettles and her law firm and Erin May at Infinity, from which plaintiff seeks to infer a conspiratorial agreement based on the actions taken her, the attorney-client relationship between NCO and Nettles does not inexorably imply that NCO knew what Nettles

---

[12]  Additionally, defendants correctly note that a complaint alleging a conspiracy between a lawyer and her client fails to state a claim under § 1985(2).  Here, Nettles was acting within the scope of her representation of NCO in the FDCPA litigation, and as such, there can be no § 1985(2) conspiracy claim asserted against her.  In *Farese v. Scherer*, 342 F.3d 1223 (11th Cir, 2003), the Eleventh Circuit concluded that an attorney acting within the scope of her representation of a client cannot be sued under § 1985(2) for conspiracy.  "We agree with the well-reasoned opinion of the Third Circuit [in *Heffernan v. Hunter*, 189 F.3d 405 (3d Cir.1999)], and hold that as long as an attorney's conduct falls within the scope of the representation of his client, such conduct is immune from an allegation of a § 1985 conspiracy." *Id.* at 1232.  Thus, insofar as plaintiff alleges that Nettles and NCO conspired with each other to intimidate her by seeking medical-records discovery and a video deposition from her, the attorney is not subject to such a claim.  Because the immunity of the attorney leaves no one for NCO to conspire with, the complaint also fails to state a claim against NCO.  *See id.* at 1232.

is alleged to have done.  Thus, again, plaintiff has failed to allege a plausible claim of conspiracy under § 1985(2) against NCO.

Finally, there are not sufficient factual allegations supporting a plausible conspiracy between Nettles and Infinity.  Assuming as true all of the factual allegations and inferences pleaded by the plaintiff, they establish that (1) plaintiff had sued NCO, Nettles' client, (2) Nettles' firm had represented Infinity in several other legal matters, (3) a former associate of Nettles' firm and a friend of Nettles, Erin May, was employed as a lawyer at Infinity, (4) plaintiff was disciplined and fired by her supervisors at Infinity, Kees, Lunsford, and Jenkins, during the pendency of plaintiff's lawsuit against NCO, and (5) supervisors at Infinity admitted that the stated reasons for plaintiff's discipline and termination were bogus.  What is missing from these allegations is (1) any fact showing that Nettles contacted May about plaintiff's lawsuit, (2) any fact showing that Nettles even knew plaintiff was employed at Infinity, (3) any fact showing that May communicated with any other person at Infinity about plaintiff's employment, and (4) any fact indicating that May and/or Nettles orchestrated actions taken by Kees, Lunsford, and Jenkins with respect to plaintiff's employment.  In the end, plaintiff's factual allegations leave the court to speculate whether Nettles knew about plaintiff's employment at Infinity, and whether she could and did attempt to influence Infinity to take bogus employment action against her.  The court is left to speculate why Infinity would agree with Nettles to expose itself to liability for no reason by taking bogus employment action against plaintiff, or why May would recommend to her employer taking such a risky course of action.  These questions mean that the actual existence of a conspiratorial agreement is nothing but conjecture, which plaintiff essentially acknowledges by pleading these allegations on the basis of "information and belief."  From plaintiff's factual allegations, the court can infer equally logical, but non-

21

conspiratorial, reasons why plaintiff was treated as she alleges she was.  Under *Twombly/Iqbal*, the factual allegations of the complaint must nudge the claim over the line of speculation, and the allegations in this complaint simply have not done so.

All claims of conspiracy in violation of § 1985(2) in Count Five are due to be dismissed for failure to state a claim.

### E.  *Section 1986 Prevention Claim*

At Count Six of the complaint, plaintiff alleges that the "Infinity defendants knew of a conspiracy to interfere with Shuler's civil rights and failed to prevent it."  Because a prevention claim under § 1986 is derivative of the existence of a conspiracy under § 1985, *see Cooksey v. Waters*, 435 Fed. Appx. 881, 883-884 (11th Cir. 2011) (*per curiam*) (unpublished); *Park v. City of Atlanta*, 120 F.3d 1157, 1159–60 (11th Cir.1997) (*per curiam*), which has not been sufficiently pleaded here, there can be no § 1986 claim.  Count Six also is due to be dismissed.

### F.  *State-Law Intentional Interference Claim*

Finally, at Count Seven of the complaint, plaintiff alleges, under Alabama state tort law, that the "legal/financial defendants, acting as third parties, interfered with plaintiff's employment relationship with Infinity."  To state such a claim, the plaintiff must allege facts from which it can be plausibly inferred that the business relationship between the plaintiff and another is interfered with by a stranger to the business relationship, resulting in damages to the plaintiff.  "[P]roperly stated, the elements of the tort are (1) the existence of a protectible business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage."  *White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009).  Interference with an employment relationship can be the basis of a claim.  *See*

*Michelin Tire Corp. v. Goff*, 864 So. 2d 1068 (Ala. Civ. App., 2002); *K-Mart, Inc. v. Stewart*, 29 So. 3d 887 (Ala. Civ. App. 2009) ("[O]ur supreme court has identified, among other things, the termination of a contract and the termination of an employment relationship as the types of actions that could give rise to a claim of intentional interference with a business relationship...") (citing *Thomas v. Williams*, 21 So. 3d 1234 (Ala. Civ. App. 2008).

This claim suffers the same problem as plaintiff's § 1985(2) conspiracy claim — the facts alleged in the complaint do not show a plausible claim that American Express, NCO, Nettles, or Morse actually caused plaintiff's termination.  Without repeating what was said with respect to the § 1895(2) conspiracy claim, there no are facts alleged in the complaint to plausibly show that either of these defendants contacted Infinity in any way to attempt to exert influence resulting in the termination of her employment.  The court can only speculate that Nettles — the only one of these defendants alleged to have any means by which to exercise such influence — actually communicated with Infinity or knew that plaintiff was employed with Infinity or otherwise attempted to harm plaintiff's job.  There are absolutely no factual allegations that American Express, NCO, or Morse had the means or inclination to attempt such influence, or that they took any steps to attempt to do so.  Accordingly, Count Seven of the complaint is due to be dismissed.

CONCLUSION AND RECOMMENDATION

Based on the foregoing considerations, it appears that the only viable claims plaintiff may have in this action are traditional age-discrimination and sex-discrimination claims under the ADEA

and Title VII against her former employer, Infinity Property & Casualty.[13]  All other claims and defendants are due to be dismissed.

Therefore, the magistrate judge RECOMMENDS the following:

1.     That defendant Infinity Property & Casualty Corporation's motion to dismiss be DENIED with respect to plaintiff's claims in Counts One, Two, Three, and Four, for age and sex discrimination under the ADEA and Title VII, respectively, but GRANTED with respect to all other claims.

2.     That the motions to dismiss by defendants Tobin Lunsford and Pamela Jenkins be GRANTED as to all claims against them.

3.     That the motions to dismiss by defendants American Express Company, NCO Financial Systems, Inc., Laura Nettles, and Wayne Morse be GRANTED as to all claims against them.


Any party may file specific written objections to this report and recommendation within fifteen (15) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fifteen (15) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal.  Written objections shall specifically identify the portions of the proposed

---

[13]   The court has not forgotten that defendant asserts that plaintiff's true employer was Infinity Insurance Company, not its parent company, Infinity Property & Casualty Corporation. Nonetheless, the defendant named in the complaint, whether correctly or not, is Infinity Property & Casualty, unless and until plaintiff decides to seek substitution.

findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

The Clerk is DIRECTED to mail a copy of the foregoing to the plaintiff.

DONE this 18th day of May, 2012.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE